# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-904V

| | |
|---|---|
| MUHAND HADDAD,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: May 22, 2025 |

*Rhonda Lorenz-Pignato*, Shannon Law Group, PC, Woodridge, IL, for Petitioner.

*Nina Ren*, U.S. Department of Justice, Washington, DC, for Respondent.

## FACT RULING ON ONSET[1]

On February 10, 2021, Muhand Haddad ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that he suffered a left-sided Table shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine administered to him on July 2, 2019.[3] Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). For the reasons set forth below, I find it more likely than not

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Petitioner alleges an injury as a result of a Tdap vaccination received "on or about July 3, 2019." Pet. ¶ 2. However, in his Response to my Order to Show Cause, Petitioner highlights that his records were later corrected to reflect the correct date of vaccination as July 2, 2019. *See* Response at 1, n.1; *see also* Ex. 2.2 at 4 (ECF No. 9-2). While not a disputed issue, the administration of the subject vaccine appears more likely than not to have occurred on July 2, 2019, as later alleged. *See,* e.g., Ex. 4 at 103-06.

that the onset of Petitioner's shoulder pain began within 48 hours of vaccination, as alleged.

## I. Relevant Procedural History

Respondent filed his Rule 4(c) Report defending this case in November 2023. Respondent's Report, ECF No. 32. Respondent made a number of arguments against Petitioner's Table SIRVA claim,[4] including that Petitioner's medical records do not attribute the onset of his pain to the subject vaccination until over five months after, but that he attended seven visits with treaters during this interim period. *Id.* at 7 (citing Ex. 4 at 75, 80-82, 84, 89, 92; Ex. 2.2[5] at 17-18, 44; Ex. 5 at 18, 59). More so, when the records first mention shoulder pain (in December 2019), they do not describe its onset as occurring within 48 hours of vaccination. *Id.* (citing Ex. 4 at 75).

After a review of the record and Respondent's arguments, I issued an Order to Show Cause, outlining the critical issues related to Petitioner's ability to satisfy the Table's 48-hour onset requirement and affording him an opportunity to submit any additional evidence to remedy this deficiency in the record.[6] ECF No. 34. In response, Petitioner submitted his own supplemental declaration, two medical records, and a written response brief ("Response"). ECF Nos. 35-36. The onset dispute is now ripe for consideration.

## II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis,

---

[4] Respondent also contested both the first and fourth QAI requirements for a Table SIRVA claim (lack of pre-existing symptoms in the vaccinated shoulder and the presence of another condition or abnormality that could explain the post-vaccination condition) and argued that the records show that Petitioner was evaluated and treated for intermittent left shoulder pain beginning in January 2019 (six months *prior* to the subject vaccination). Respondent's Report at 7 (citing Ex. 4 at 123). Such treatment temporally followed a motor vehicle accident ("MVA") – although Petitioner reported that such left shoulder pain began prior to the MVA. *See id.* Petitioner was subsequently diagnosed with cervical radiculopathy and treated with physical therapy ("PT") until February 2019, at which time he had residual pain and tightness. *Id.* (citing Ex. 4 at 123; Ex. 5 at 79-156). I will note, however, these arguments were not the bases on which Respondent disputed Petitioner's onset contentions. *See id.*

[5] While this exhibit is labeled as "Exhibit 2.2," it is filed using the label "Exhibit 3.2." *See* ECF No. 9-3. I will refer to this exhibit (ECF No. 9-3) using the label on the document itself – Exhibit 2.2.

[6] I also noted that – while not the basis for my Order to Show Cause – Respondent's remaining objections regarding Petitioner's pre-vaccination history, and the presence of another condition or abnormality (cervical radiculopathy) that could explain Petitioner's post-vaccination symptomology, had some merit and *could* likewise ultimately preclude Petitioner from establishing a Table SIRVA claim, although it would require additional fact development to assess the strength of these objections.

2

conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

The Court has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Indeed, a special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III. Relevant Factual Evidence

I make this finding after a complete review of the record to include all medical records, declarations, and additional evidence filed, and in particular the following:[7]

- Petitioner received the Tdap vaccine alleged as causal on July 2, 2019,[8] while at a visit for chest pain and tingling with his primary care physician ("PCP"). Ex. 2 at 1; Ex. 4 at 103-06.

- Petitioner has stated that upon receiving the vaccination, he "immediately had a feeling like the needle had hit something hard in [his] shoulder and [he] experienced some immediate pain." Ex. 1 ¶ 6. He notes that "as the day went on," he "began to experience more pain in [his] left shoulder and some restrictions in the range of motion [("ROM")]." *Id.* ¶ 8. He tried unsuccessfully to self-treat with cold packs, Tylenol, and stretching; instead, the pain "progressively got worse." *Id.* ¶¶ 9-10; Ex. 12 ¶¶ 5-6.

- Six days post-vaccination, on July 8, 2019, Petitioner had an appointment with a cardiologist to address his chest pain and palpitations. Ex. 4 at 92. The contemporaneous medical records do not show that Petitioner mentioned complaints of shoulder pain during this visit. *See id.* The records do, however, memorialize that Petitioner reported bilateral arm *tingling* that had been "occurring for years." *Id.* Later that month, on July 12, 2019, Petitioner underwent a transthoracic echocardiogram, during which he also made no complaints of left shoulder pain. Ex. 5 at 59.

---

[7] While I have reviewed all the evidence filed to-date in this case, only evidence related to onset will be discussed herein, though other facts may be provided as necessary.

[8] *See supra,* note 3 (explaining the date of vaccine administration being on July 2, 2019, as ultimately alleged).

4

- On September 6, 2019, Petitioner followed up with his PCP for chest pain and was subsequently sent to the emergency room. Ex. 4 at 89. He did not mention left shoulder complaints during this visit. *See id.* Throughout the rest of September, Petitioner saw his cardiologist (on September 17, 2019) with complaints of shortness of breath. *Id.* at 84. On September 25, 2019, at the direction of his cardiologist, Petitioner underwent an exercise stress test. Ex. 5 at 18. He likewise did not complain of left shoulder symptoms at any of these visits.

- Petitioner returned to his PCP on November 14, 2019, with a "chief complaint" of "abdominal pain." Ex. 4 at 80. Petitioner also reported "discomfort in the left upper arm" but "denie[d] pain in the shoulders." *Id.* A physical examination revealed normal ROM, normal muscle strength and tone, no swelling, erythema, or "discomfort or tenderness on palpation of the bilateral upper arms." *Id.* at 82. The "other visit diagnoses" lists "left upper arm pain." *Id.*

- Petitioner contends (in his original affidavit) that during his July 8, September 6, and November 14, 2019 visits with his PCP,[9] he "complained . . . about the left shoulder pain [he] was still having since getting that tetanus shot, however [the treater's] care seemed to be focused on [his] other health complaints and not on [his] shoulder." Ex. 1 ¶ 10.

- In his second declaration, drafted in response to my Order to Show Cause, Petitioner elaborated on this, maintaining that by his July 8, 2019 cardiology visit, he "knew that [his] shoulder pain was caused by the vaccination and that it didn't have anything to do with [his] heart. Since [the physician] was a cardiologist and did not treat shoulders, [he] focused on discussing [his] chest pains[.]" Ex. 12 ¶ 9. Additionally, since this visit was only a week after the subject vaccination, Petitioner "still thought the pain would go away on its own, with time and self-treatment." *Id.* Likewise, he contends that his treater "stayed focused on addressing the serious issue of [his] chest pains" (and later scrotal pain) during his September 6, November 14, and December 4, 2019 visits. *Id.* ¶¶ 10, 13, 15.

- Over five months post-vaccination, Petitioner saw his PCP on December 4, 2019, for a chief complaint of "scrotal pain." Ex. 4 at 75. He also

---

[9] While Petitioner originally recalled his July 8, 2019 visit as being with his PCP, it was actually with his cardiologist (Ex. 4 at 92) – a fact he appears to have realized later on and addressed in his supplemental declaration. *See* Ex. 12 ¶¶ 8-9 (explaining that his July 8th office visit was with a cardiologist). I do not consider this discrepancy to be a material error.

5

"complain[ed] of chronic left shoulder pain for the past 3 months" – or since roughly September 2019. *Id.* He did not link his pain to the subject vaccination at that time, however. *See id.* A physical examination revealed normal ROM. *Id.* at 77. The assessment included "chronic left shoulder pain" and Petitioner was referred to an orthopedist and for an x-ray. *Id.* at 77-78.

- On December 12, 2019 (five months and ten days post vaccination), Petitioner saw an orthopedist for his left shoulder pain, which he attributed to his receipt of a vaccination. Ex. 2.2 at 44. Specifically, he reported that he had received a "vaccine back on 07/14/2019 that was the impetus for the beginning of his shoulder pain." *Id.* at 46. The orthopedist opined that Petitioner's physical examination (showing decreased ROM) was consistent with subacromial bursitis. *Id.* at 47. Petitioner received a steroid injection and was referred to physical therapy ("PT"). *Id.* Petitioner also filled out an intake form for this visit and noted that his injury began "after vaccine/DTAP" on "7/14/2019." Ex. 9 at 262.

- Petitioner underwent an initial PT evaluation on December 21, 2019. Ex. 2.2 at 72. Petitioner's chief complaint was listed as "left shoulder pain months after vaccine" with the "onset date" listed as "July was vaccine." *Id.* at 73. The "mechanism of injury" was documented as "vaccine." *Id.*

- During an August 20, 2020 orthopedic follow up, the orthopedist noted that Petitioner's "symptoms actually started after he obtained a vaccination into his left shoulder in 07/2019." Ex. 2.2 at 319. More so, "[s]ince that time, he has had this nontraumatic progressive pain." *Id.*

- Petitioner began a second round of PT on August 27, 2020. Ex. 2.2 at 347. Petitioner stated that he received a vaccination in his left shoulder in July 2019 "and noticed increased pain ever since." *Id.* at 348.

- On October 8, 2020, Petitioner followed up with his orthopedist for his left shoulder diagnoses of rotator cuff tendinopathy and subacromial bursitis that "started after he had [a] Tdap vaccination in his left shoulder in 07/2019." Ex. 2.2 at 447.

- No other medical record or affidavit/witness declaration evidence regarding the onset of Petitioner's post vaccination shoulder injury has been filed.

6

### IV. Finding of Fact Regarding Onset

A petitioner alleging a SIRVA claim must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B) and 3(c)(10)(ii) (QAI criteria)).

As stated above, Respondent contends (in part) that Petitioner's medical records do not support the conclusion that the onset of his pain occurred within 48 hours of vaccination. Respondent's Report at 7. But the totality of the evidence is favorable to Petitioner on this issue – albeit barely. The aforementioned medical records, coupled with Petitioner's filed witness declarations, establish that Petitioner reported to treaters an onset close-in-time to vaccination, and that he was experiencing symptoms in the relevant timeframe. *See,* e.g., Ex. 2.2 at 72-73, 319, 347-48, 447 (ECF No. 9-3); Exs. 1, 12.

Admittedly, the record establishes that Petitioner delayed seeking treatment for his left shoulder pain for over five months (until December 4, 2019), and did not specifically link this pain to the subject vaccination until a week later, on December 12, 2019. But this fact does not by itself preclude a finding of Table onset. There is no requirement that a Program claimant prove onset with evidence that was generated *within* the six-month severity timeframe, let alone contemporaneous to the two-day onset period. And similarly-lengthy delays have in many other cases not prevented a favorable onset finding. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury).

Likewise, the fact that Petitioner sought care on approximately *six*[10] occasions during the initial gap between vaccination and his first record-memorialized complaint of shoulder pain does not defeat an onset finding. *See* Ex. 4 at 75, 80, 84, 89, 92; Ex. 5 at 18, 59. In fact, almost *all* of those appointments were with a cardiac specialist for acute and serious chest pain or shortness of breath issues, and/or were for specific testing (i.e., his July 12th echocardiogram or his September 25, 2019 exercise stress test), and thus

---

[10] While Respondent contends that Petitioner had seven intervening medical visits without reporting left shoulder pain, his Rule 4(c) report in fact describes six intervening visits. Respondent's Report at 2-3. Still, Petitioner's Response to my Order to Show Cause describes a seventh intervening visit as occurring on November 15, 2019, with a gastroenterologist for Petitioner's pre-existing GERD; he did not describe left shoulder symptoms. Ex. 2.2 at 15-21. I do not find this discrepancy to be material, as this additional intervening visit was nonetheless with a specialist and Petitioner similarly would likely not have been prompted to report shoulder-related complaints.

did not present occasions for Petitioner to report an unrelated musculoskeletal problem. *See id.*

By contrast, two of these visits (on September 6 and November 14, 2019), were with Petitioner's PCP – to whom it would have been reasonable to report persistent shoulder pain (especially if the pain was as severe as Petitioner alleges in his affidavit at that time). Ex. 4 at 80, 89. But I do not find Petitioner's omission of shoulder complaints at these visits to completely undermine a two-day onset finding, when considered against the bulk of the evidence. This is especially true in light of Petitioner's declarations stating that he had mentioned shoulder complaints during the September 6th and November 14th PCP visits, but that such complaints were not recorded because his treater's care was focused on his acute chest pain issues. Ex. 1 ¶ 10; Ex. 12 ¶¶ 10, 13, 15.

In addition, and as I have previously noted, SIRVA petitioners often put off seeking shoulder-related care based on the reasonable assumption that the pain is normal and will resolve on its own over time, especially since patients are often told by medical providers at the time of vaccination to expect some soreness and pain. This appears to have been the case here, with Petitioner explaining he thought his pain left over from the vaccination would resolve with time and such specialists could not treat such pain. *See,* e.g., Ex. 12 ¶¶ 9-10, 13, 15.

*Some* records support an alternative onset finding, but they must be weighed against the entirety of the record, and thus do not ultimately prove fatal to Petitioner's onset contentions. Such entries still contain references to left upper extremity symptomology, thus bolstering Petitioner's contentions in his affidavit that he mentioned left shoulder ailments as secondary issues and as a result they were not the focus of care. *See,* e.g., Ex. 4 at 80-82 (the November 14, 2019 PCP visit for "abdominal pain" wherein Petitioner had arm pain but "denie[d] pain in the shoulders" and the visit diagnoses included "left upper arm pain"); Ex. 4 at 75, 77-78 (the December 4, 2019 PCP visit for a "primary complaint" of "scrotal pain" but also a complaint of "chronic left shoulder pain for the past 3 months" – or since September 2019, resulting in an assessment including "chronic left shoulder pain").

Otherwise, the medical records establish that Petitioner affirmatively and repeatedly linked his shoulder pain to the subject vaccine – beginning with the December 12th treatment encounter, at which time he reported that "he had a vaccine back on 07/14/2019 that was the impetus for the beginning of his shoulder pain." *See* Ex. 2.2 at 44-46; *see also* Ex. 9 at 262 (a December 12, 2019 orthopedic intake form listing the injury as "after vaccine/DTAP" and listing the date as "7/14/2019"). This reporting – while

incorrectly describing the precise date of vaccination – provides support for a Table-consistent onset.

And despite some ambiguity, the remaining entries in the medical records support the conclusion that Petitioner's injury likely began soon after vaccination. *See,* e.g., Ex. 2.2 at 72-73 (a December 21, 2019 initial PT note of "left shoulder pain months after vaccine" with the "onset date" listed as "July" and the "mechanism of injury" documented as "vaccine."); Ex. 2.2 at 319 (an August 20, 2020 orthopedic note that "symptoms actually started after he obtained a vaccination into his left shoulder in 07/2019" and "[s]ince that time" he has had pain); Ex. 2.2 at 347-48 (an August 27, 2020 PT note that he had "noticed increased pain ever since" his July 2019 vaccination); Ex. 2.2 at 447 (the October 8, 2020 orthopedic note that left shoulder pain "started after he had [a] Tdap vaccination in his left shoulder in 07/2019."). These record entries corroborate the contentions made in Petitioner's declarations that his left shoulder pain began in July 2019 after his receipt of a Tdap vaccine – thus supporting an onset soon after vaccination. *See* Exs. 1, 12.

Of course – a delay of treatment that temporally *nearly* matches the Act's severity timeframe, as here, is *strong evidence* that the claimant's pain was not notably severe. I can and do conclude from such a record that Petitioner lived with the pain easily, and for a long period of time. This fact *will* impact any pain and suffering award issued in this case – and Petitioner must therefore act accordingly in calculating damages to be requested.

Finally, I note that this fact determination does not resolve the remaining disputed QAI criteria – that Petitioner had a history of symptoms in the vaccinated shoulder, or that there is another condition or abnormality present that could explain Petitioner's post-vaccination condition. Respondent has not had a sufficient opportunity to address Petitioner's arguments on these issues. *Compare* Respondent's Report at 7-8 (contesting QAIs I and IV in two paragraphs), *with* Petitioner's Response at 1-40; Ex. 12 at 1-15 (discussing these factors at length). I encourage the parties to explore settlement, but with the knowledge that these issues remain.

### Conclusion and Scheduling Order

If at any time informal resolution (of either settlement or proffer) appears unlikely, given that the claim has been pending in SPU for over one year (having been assigned in September 2022), the parties should propose a method for moving forward, i.e., with a proposed briefing schedule or otherwise stating how they wish to proceed.

Accordingly, **by no later than Monday, June 23, 2025**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a reasonable settlement demand and supporting documentation for Respondent's consideration. **If applicable, the status report may also state whether Respondent wishes to file an amended Rule 4(c) report and stating how much time is needed to submit said report.**

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master